UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
ORATAI CULHANE,               )
                              )
               Plaintiff,     )
                              )
          v.                  )  CIVIL ACTION
                              )  NO. 11-11098-WGY
AURORA LOAN SERVICES          )
OF NEBRASKA,                  )
                              )
               Defendant.     )
_____)
```

MEMORANDUM & ORDER

YOUNG, D.J.                                    November 28, 2011

    **"What does a judge do?"** asked my three year old
granddaughter Mia.  Without half thinking, I answered,
**"A judge teaches law to people who come to court."**

Upon reflection, that answer is about as good as any.[1]  Trial

---

[1] At least it was when I joined the district court bench over a quarter century ago.  Yet, even then

> a "sea-change" was taking place among federal trial judges.  Many no longer perceived their primary tasks as deciding motions after oral argument and presiding as neutral referees at trials.  They were encouraged to consider themselves managers whose job was to dispose of cases expeditiously.  From that perspective trials came to seem wasteful.

Stephen B. Burbank & Stephen S. Subrin, <u>Litigation and Democracy: Restoring a Realistic Prospect of Trial</u>, 46 Harv. C.R.-C.L. L. Rev. 399 (2011) (footnote omitted); <u>see</u> Philip W. Tone, <u>The Role of the Judge in the Settlement Process</u>, Fed. Judicial Ctr., Seminars for Newly Appointed United States District Judges 57, 60 (West 1975) ("Settlement is usually the avenue that allows a more just result than trial."); Fed. Judicial Ctr., Seminars for Newly Appointed United States District Judges (West 1971) (stating that trials are a "failure" (quoting Judge Fred J. Cassibry));
Today, the conception that the judge is primarily an actual law teacher during court proceedings is held only by a shrinking minority.  One judge at least has the courage to tell it like it is:

> [There] is a change in the very culture of the United States District Court.  It is no longer a trial court in many parts of the country.  I have said it and I mean it, but it functions more like a state highway department.  They will not try cases.  More fundamentally, they will not set the cases for trial because the parties will mediate this case, and if I do not set it for trial, eventually it will settle.  And settlement is a better reconciliation, because this is about relationships.
> No it is not!  It is about property, it is about money, and it is about serious disputes that are vital to the economy and need to be resolved fairly and straight up.

Patrick E. Higginbotham, <u>EDTX and Transfer of Venue</u>, 14 SMU Sci. & Tech. L. Rev. 191, 197 (2011).  Out of focus, we in the district courts are managing ourselves into oblivion.  The larger consequences of the loss of focus on our core judicial responsibility and its tragic consequences for American democracy

judges teach the law to lawyers through evidentiary rulings; they teach the law to juries through plain, easy to understand instructions; they teach the law to offenders and the public alike at sentencing hearings;[2] and they teach the law to litigants through careful opinions that explicate judicial choice as "reasoned choice, candidly explained."  Robert E. Keeton, Judging 1 (1990).  Yet, as I explained to Mia, they teach the law only "to people who come to court."  Trial judges have no roving commission to teach the law generally. Their teaching is limited only to "cases and controversies," U.S. Const. art. III, and then only when the standards of ripeness, standing, and redressability are met.

Frankly, this is the central tension in this opinion, as much of what I have to say addresses the conduct of a non-party, the Mortgage Electronic Registration Systems, Inc. ("MERS").[3] While I consider this discussion appropriate to render judgment

---

are detailed in Robert P. Burns, The Death of the American Trial (2009).

[2] There is an increasing cloak of secrecy being drawn around judicial sentencing proceedings.  This is both unwarranted and unnecessary.  It serves to diminish the judiciary in the eyes of the public.  The matter is discussed in Richardson v. United States, 477 F. Supp. 2d 392, 402-06 (D. Mass. 2007).

[3] MERS was invited to submit a brief amicus curiae and did so.  Bench Mem. L. MERS ("MERS's Mem."), ECF No. 36.  The Court gratefully acknowledges this well-written brief.

here, it must be borne in mind that MERS is not a litigant and is not bound in any way by this discussion.

## I.   INTRODUCTION

Oratai Culhane ("Culhane") brought this action against Aurora Loan Services, LLC ("Aurora") to prevent the imminent foreclosure of her family's home in Milton, Massachusetts (the "subject property").  Aurora, after removing the action from state court, moved for summary judgment.  In ruling on the motion, this Court must resolve whether the mortgage properly was assigned from MERS (the original mortgagee), to Aurora and, if so, whether Aurora otherwise has standing to foreclose under the statutory power of sale.

### A.   Procedural Posture

Acting pro se, Culhane filed her complaint and a motion for a temporary restraining order ("TRO") in the Massachusetts Superior Court sitting in and for the County of Norfolk on June 17, 2011, to stop the foreclosure sale of the subject property, which then was scheduled to take place on June 20, 2011.  Compl. & TRO Mot., ECF No. 4.  That same day, Aurora filed its notice of removal to this Court.  Notice Removal, ECF No. 1.

The motion for a TRO was set to be heard by this Court on June 22, 2011.  On June 21, Aurora filed its opposition papers. Def.'s Mem. Opp'n Pl.'s TRO Mot., ECF No. 5; Aff. Kristen Trompisz Supp. Def.'s Mem. Opp'n Pl.'s TRO Mot., ECF No. 6.

4

At the hearing on the motion for a TRO, the Court allowed Culhane's oral motion for a six-week continuance to allow her time to retain an attorney.  Aurora requested time to file a motion for summary judgment, which it did two days later.  Mot. Summ. J., ECF No. 7; Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), ECF No. 8.  The hearing on the summary judgment motion was set for July 20, 2011.  Aurora agreed to postpone the foreclosure sale until after that date.

On July 15, 2011, Culhane retained counsel, who promptly requested an extension of time to respond to Aurora's summary judgment motion.  Pl.'s Mot. Extension Time, ECF No. 18.  The Court allowed the motion, but declined to continue the hearing to a later date.

At the hearing on the motion for summary judgment on July 20, 2011, the Court took the matter under advisement.  Culhane filed her opposition to Aurora's motion for summary judgment on August 5, 2011.  Opp'n Mot. Summ. J., ECF No. 20; Mem. L. Opp'n Mot. Summ. J. ("Pl.'s Mem."), ECF No. 24.  On August 22, 2011, the Court granted Aurora's summary judgment motion, save as to the question of Aurora's standing to foreclose in view of MERS's involvement in the chain of title.  On September 7, 2011, the Court heard further oral argument on the motion, focusing its inquiry on MERS's role in the assignment to Aurora, see Hr'g Tr., ECF No. 32, and subsequently ordered Aurora to submit documents

5

pertaining to MERS's practice of appointing non-employee

certifying officers for the purpose of making mortgage

assignments, see Order, ECF No. 31.

On September 19, 2011, in accordance with the Court's order,

Aurora submitted, as attachments to its supplemental memorandum

in support of its motion for summary judgment, various documents

produced by MERS detailing its operations, specifically its

(1) Rules of Membership (the "MERS Rules"); (2) Terms and

Conditions; (3) Procedures Manual; (4) Quality Assurance Quick

Reference Guide; and (5) Quality Assurance Procedures Manual.

Supplemental Mem. Supp. Mot. Summ. J. ("Def.'s Supplemental

Mem."), ECF No. 34; id., Exs. B-F, ECF Nos. 34-2 to -7.  The next

day, with the Court's permission, MERS filed a memorandum of law

to assist the Court in understanding its unique role in the

mortgage industry.  Bench Mem. L. MERS ("MERS's Mem."), ECF No.

36.  On October 3, 2011, Culhane filed a supplemental memorandum

in opposition to Aurora's motion for summary judgment.

Supplemental Mem. Opp'n Mot. Summ. J. ("Pl.'s Supplemental

Mem."), ECF No. 37.

   **B.   Facts**[4]

---

[4] As required on motions for summary judgment, the factual
summary presented here consists of undisputed facts and disputed
facts in the light most favorable to Culhane, the non-moving
party.  The Court is to review the record as a whole, but "it
must disregard all evidence favorable to the moving party that
the jury is not required to believe."  Reeves v. Sanderson
Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).  Accordingly,

Culhane is the record owner of the subject property, where she has resided for sixteen years with her two children.  Compl. ¶ 2; Pl.'s Resp. Def.'s Statement Facts Supp. Mot. Summ. J. ("Pl.'s Resp. SOF") ¶ 1, ECF No. 22; Aff. Oratai Culhane ¶ 1, ECF No. 23.  On April 4, 2006, Culhane executed a promissory note to Preferred Financial Group, Inc. doing business as Preferred Mortgage Services ("Preferred") in the amount of $548,000.  Pl.'s Resp. SOF ¶ 2; Aff. Cristal Blanchard Supp. Def.'s Mot. Summ. J., Ex. A, Adjustable Rate Note, ECF No. 16.  As security for the promissory note, Culhane executed a mortgage on the subject property to MERS as nominee for Preferred.  Pl.'s Resp. SOF ¶ 3; Aff. Cristal Blanchard Supp. Def.'s Mot. Summ. J., Ex. B, Mortgage ("Mortgage"), ECF No. 16-1.  The mortgage was dated April 4, 2006, and recorded April 11, 2006, in the Norfolk County Registry of Deeds, in Book 23562, at Page 348.  Pl.'s Resp. SOF ¶ 3.

On April 7, 2009, the mortgage was assigned from MERS as nominee for Preferred to Aurora.[5]  Pl.'s Resp. SOF ¶ 4; Aff. Cristal Blanchard Supp. Def.'s Mot. Summ. J., Ex. C, Corporate Assignment Mortgage ("Corporate Assignment Mortgage"), ECF No.

---

the Court must disregard evidence in favor of Aurora — even if uncontradicted — that the jury would be free to disbelieve.  See id.

[5] The assignment lists its "effective date" as April 1, 2008.  See Aff. Cristal Blanchard Supp. Def.'s Mot. Summ. J., Ex. C, Corporate Assignment Mortgage, ECF No. 16-2.

16-2.   Aurora is a national loan servicing corporation with its principal place of business in Nebraska.  Compl. ¶ 3.   The assignment was executed before a notary public by JoAnn Rein, who was an employee of Aurora but acting as a vice president of MERS at the time of the assignment.  Pl.'s Resp. SOF ¶ 4; see Corporate Assignment Mortgage; MERS's Mem., Ex. A, Corporate Resolution, ECF No. 36-1 (naming JoAnn Rein a certifying officer of MERS as of August 8, 2008).  The assignment was recorded on April 24, 2009, in the Norfolk County Registry of Deeds, in Book 26575, at Page 562.  See Corporate Assignment Mortgage.

As evidenced by an undated endorsement on the back of the note, Deutsche Bank Trust Company Americas ("Deutsche"), as trustee for Residential Accredit Loans Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO5 (the "RALI Series 2006-QO5 Trust"), is the current note holder.  Aff. Cristal Blanchard Supp. Def.'s Mot. Summ. J. ¶ 9, ECF No. 15; Aff. Martin Flax Opp'n Mot. Summ. J., Ex. C, Prospectus Supplement RALI Series 2006-QO5 Trust S-3, May 26, 2006 (not filed electronically); see Note Endorsement & Allonge (not filed electronically).  The RALI Series 2006-QO5 Trust holds a pool of one- to four-family residential, payment-option, adjustable-rate, first-lien mortgage loans with a negative amortization feature.  Prospectus Supplement RALI Series 2006-QO5 Trust S-1.  The cut-off date for mortgage loans to be transferred into this trust was

May 1, 2006.  Id. at S-3.  The Mortgage Loan Schedule for the trust shows that Culhane's loan is part of the pool, but does not identify the date of transfer.[6]  Letter Reneau Longoria, Attach. 1, Mortgage Loan Schedule, ECF No. 41-1.  Effective April 1, 2008, Aurora, as Deutsche's agent, services the loans held by the trust.  Aff. Cristal Blanchard Supp. Def.'s Mot. Summ. J. ¶ 9; Supplemental Mem. Supp. Mot. Summ. J., Ex. G, Master Servicing Assignment & Assumption Agreement 1, ECF No. 34-8.

On April 30, 2009, Aurora filed a complaint pursuant to the Servicemembers Civil Relief Act (the "Servicemembers Act") in the Massachusetts Land Court and satisfied the statute's requirements by causing the order of notice to be published, served, and recorded, and by subsequently submitting its return on the order to the Land Court.  Pl.'s Resp. SOF ¶¶ 5-6; Aff. Reneau Longoria Supp. Def.'s Mot. Summ. J., Ex. AA, Land Ct. Compl., ECF No. 10-1.  On October 21, 2009, the Land Court issued its judgment that Culhane was not entitled to the benefits of the Servicemembers Act and that Aurora could execute the power of sale contained in

---

[6] The earliest date on which the physical location of the collateral file, which includes the original note, was recorded is April 15, 2008.  Letter Reneau Longoria, Attach. 3, Location History Collateral File, ECF No. 41-3.  The collateral file appears to have been transmitted in response to a foreclosure-related request on April 16, 2009, but the origin and destination of this transmittal are not ascertainable on this record.  Id. The note came into the possession of Aurora's custodian of records on May 13, 2009.  Id.  It is now shelved in a filing room.  Id.

the mortgage.  Aff. Reneau Longoria Supp. Def.'s Mot. Summ. J.,
Ex. AC, Land Ct. J., ECF No. 14-3.

Aurora first scheduled the foreclosure sale for October 22,
2009.  Pl.'s Resp. SOF ¶ 7.  The notice of mortgagee sale was
sent to be published on September 21, 2009.  Id. ¶ 8.  Pursuant
to Massachusetts General Laws chapter 244, section 14, Aurora
sent letters giving notice of its intent to foreclose the
mortgage and pursue a deficiency judgment to Culhane, MERS, and
Countrywide Home Loans, Inc. on September 24, 2009.  Id. ¶ 9;
Aff. Reneau Longoria Supp. Def.'s Mot. Summ. J., Ex. AB, Notice
Intent Foreclose Mortgage, Sept. 23, 2009, ECF No. 10-2.

The foreclosure sale scheduled for October 22, 2009, was
cancelled prior to that day.  Pl.'s Resp. SOF ¶ 11.  On June 3,
2010, the foreclosure process resumed, and then was put on hold
numerous times over the course of nearly a year while Aurora
reviewed Culhane's file for loss mitigation, including a loan
modification under the Home Affordable Modification Program
("HAMP"), and while Culhane filed, and then dismissed, a series
of Chapter 13 bankruptcy actions.  Id. ¶¶ 13-39.

On May 12, 2011, Culhane was denied a HAMP modification as
well as an in-house modification by Aurora.  Id. ¶ 40.  On May
16, 2011, the foreclosure sale was postponed until June 20, 2011,
to allow Culhane to appeal pursuant to the HAMP denial
guidelines.  Id. ¶ 41.  On May 24, 2011, Culhane terminated her

latest Chapter 13 bankruptcy action.  <u>Id.</u> ¶ 42.  On June 13,
2011, continued foreclosure sale letters were sent to all
interested parties.  <u>Id.</u> ¶ 43; Aff. Reneau Longoria Supp. Def.'s
Mot. Summ. J., Ex. AM, Notice Mortgagee's Cont. Foreclosure Sale,
ECF No. 14-13.

After Culhane filed her complaint and motion for a TRO and
Aurora removed the action to this Court on June 17, 2011, Aurora
postponed the foreclosure sale by public proclamation.  Pl.'s
Resp. SOF ¶¶ 44-46.  The sale was scheduled for July 5, 2011, but
in light of the hearing before this Court on July 20, 2011,
Aurora agreed to postpone the sale until after that date.  <u>Id.</u> ¶
47.  When this Court took Aurora's summary judgment motion under
advisement, it postponed the foreclosure sale indefinitely,
pending the present Memorandum and Order.

The property is valued at approximately $480,000.  <u>Id.</u> ¶ 48.
The loan remains in default.  <u>Id.</u> ¶ 50.

## II.  STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue
of fact is "genuine" if there exists a sufficient evidentiary
basis on which the trier of fact could find for the non-moving
party.  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).  A fact is "material" if it will affect the outcome of

11

the case under the applicable law.  Id.  The moving party bears
the burden of showing that no genuine issue of material fact
exists.  <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323 (1986).
"The evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor."  <u>Anderson</u>,
477 U.S. at 255.  Save as to facts admitted by both parties, the
court must disregard all evidence, even if unopposed, which the
jury is free to reject, i.e., all evidence upon which a party
bears the burden of proof.  <u>Reeves</u> v. <u>Sanderson Plumbing Prods.,</u>
<u>Inc.</u>, 530 U.S. 133, 151 (2000).  Thus, summary judgment may be
granted when a fair-minded jury could reach only one conclusion:
in favor of the moving party.

## III.  ANALYSIS

It is clear beyond peradventure that Culhane is
substantially behind in paying her mortgage and appears unable to
remediate her default.  This, however, does not render her an
outlaw, subject to having her home seized by whatever bank or
loan servicer may first lay claim to it.  She still has legal
rights.  Everything that follows attempts to sort out these
competing claims.

In moving for summary judgment, Aurora contends that it has
established its standing to foreclose by obtaining an assignment
of Culhane's mortgage from MERS, the original mortgagee of
record, prior to fulfilling its statutory obligation to publish

and send notice of sale to all interested parties.  Def.'s Mem.
8-9.  Aurora argues that a mortgagee, or an assignee of the
mortgagee, need not be the holder of the underlying promissory
note to exercise the power of sale under Massachusetts General
Laws chapter 183, section 21, and chapter 244, section 14.
Def.'s Supplemental Mem. 4-6.  Even were unity of the note and
mortgage a prerequisite to foreclosure in Massachusetts, Aurora
asserts that here such unity exists because Aurora not only is
the assignee of the mortgage, but also is the servicer of the
loan on behalf of the current holder of the note, Deutsche.  Id.
at 5-6.

       Culhane, in contrast, argues that a mortgagee must be the
note holder to initiate foreclosure proceedings, and she claims
that Aurora has not presented evidence demonstrating that
Deutsche lawfully holds her note.  Pl.'s Supplemental Mem. 5-6.
She asserts that Deutsche must have become the note holder on or
before May 1, 2006, the cut-off date for loans to be transferred
into the RALI Series 2006-QO5 Trust, for its ownership interest
to be valid.  Id.  Culhane further argues that without knowing
the date on which Deutsche became the note holder, it cannot be
resolved on the summary judgment record whether Deutsche actually
held the note when it instructed Aurora to obtain an assignment
of the mortgage and then to foreclose.  Id. at 11.

While the parties dispute the timing of the transfer of the note to Deutsche and what bearing, if any, it has on Aurora's ability to foreclose, they agree that the mortgage was assigned by MERS to Aurora on April 7, 2009. The assignment was executed on a date before the notice of sale by an individual purporting to have the requisite authority to make the assignment. Because the assignment ostensibly conformed to the strictures of Massachusetts law, MERS's appearance in the chain of title to Culhane's mortgage could go by unnoticed. Culhane argues, however, that the presence of MERS, a privatized system for the registration and tracking of home mortgage loans that directly has facilitated the pooling and conversion of such loans into mortgage-backed securities, in the chain of title is hardly as innocuous as it may seem. Pl.'s Supplemental Mem. 2-3.

Nationwide, courts are grappling with challenges to MERS's power to assign mortgages as well as its practice of deputizing employees of other companies to make assignments on its behalf. The present case is distinct only in that it is this Court's first encounter with MERS and with the question whether its involvement in the origination and assignment of a mortgage loan clouds record title to the mortgaged property. The public has an interest in ensuring the liquidity of the mortgage market. Thus, even if Culhane is unable to exercise her equitable right of redemption and foreclosure of her mortgage loan is inevitable,

14

title must pass free of cloud and not subject to challenge in any future action for summary process or to try title on the ground that the foreclosure process was conducted unlawfully.  See Bevilacqua v. Rodriquez, 460 Mass. 762, 772 (2011); Bank of N.Y. v. Bailey, 460 Mass. 327, 333-34 (2011).

   A.   **Legal Framework**

      1.   **Statutory Power of Sale**

   Massachusetts is a non-judicial foreclosure state: a mortgagee need not obtain judicial authorization to foreclose on a mortgaged property.  See Mass. Gen. Laws ch. 183, § 21 (statutory power of sale); id. ch. 244, § 14 (procedure for foreclosure under power of sale).  A mortgagee may foreclose by exercise of the statutory power of sale, so long as that power is granted in or incorporated by reference into the mortgage itself. U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 646 (2011); see Aliberti v. GMAC Mortg., LLC, 779 F. Supp. 2d 242, 249 (D. Mass. 2011) (Gorton, J.).  There is an exception for the limited judicial procedure involved in certifying that the mortgagor is not a beneficiary of the Servicemembers Act.  Ibanez, 458 Mass. at 646.

   Under Massachusetts General Laws chapter 183, section 21, after a mortgagor defaults in the performance of the underlying note, the mortgagee may sell the property at a public auction, conveying the property to the purchaser in fee simple.  Ibanez,

458 Mass. at 646.  "Even where there is a dispute as to whether
the mortgagor was in default or whether the party claiming to be
the mortgage holder is the true mortgage holder, the foreclosure
goes forward unless the mortgagor files an action and obtains a
court order enjoining the foreclosure."  Id.  "Recognizing th[is]
substantial power that the statutory scheme affords to a mortgage
holder to foreclose without immediate judicial oversight," the
Supreme Judicial Court of Massachusetts has held that a mortgagee
who exercises the power of sale must comply strictly with its
terms.  Id. (quoting Moore v. Dick, 187 Mass. 207, 211 (1905));
Cranston v. Crane, 97 Mass. 459, 463 (1867) ("To effect a valid
sale under a power, all the directions of the power must be
complied with.").

First, the statutory power of sale may be exercised only by
"the mortgagee or his executors, administrators, successors or
assigns."  Mass. Gen. Laws ch. 183, § 21.  A "person acting in
the name of [the] mortgagee" also may "do all the acts authorized
or required by the power" of sale.  Id. ch. 244, § 14.  An effort
to foreclose by an entity "lacking 'jurisdiction and authority'
to carry out a foreclosure" - i.e., not holding the mortgage at
the time of notice and sale - is void.  Ibanez, 458 Mass. at 647
(quoting Chace v. Morse, 189 Mass. 559, 561 (1905)); see
Aliberti, 779 F. Supp. 2d at 249.

16

Where a mortgage has been assigned, the assignee may foreclose "regardless whether the assignment has been recorded," so long as the assignment takes places prior to the publication of notice and execution of sale. Ibanez, 458 Mass. at 654; see id. at 656 (Cordy, J., concurring) ("The court's opinion clearly states that . . . assignments do not need to be in recordable form or recorded before the foreclosure, but they do have to have been effectuated."). A foreclosing entity may provide either a single assignment directly from the mortgagee of record or a complete chain of assignments linking it to the mortgagee of record. Id. at 651 (majority opinion). The foreclosing entity must hold the mortgage at the time of the notice and sale because an attempt to foreclose prior to a valid assignment of the mortgage is a "structural defect that goes to the very heart of defendant's ability to foreclose by advertisement." Id. at 647 (quoting Davenport v. HSBC Bank USA, 739 N.W.2d 383, 384-85 (Mich. Ct. App. 2007)).

An assignment is effective, however, without the need independently to establish the authority of the assignor to make the assignment. In re Marron, 455 B.R. 1, 8 (Bankr. D. Mass. 2011) (citing Aliberti, 779 F. Supp. 2d at 249; Kiah v. Aurora Loan Servs., LLC, No. 10-40161-FDS, 2011 WL 841282, at *7 (D. Mass. Mar. 4, 2011) (Saylor, J.)). An assignment of a mortgage

> if executed before a notary public, justice of the peace
> or other officer entitled by law to acknowledge

17

instruments, whether executed within or without the
commonwealth, by a person purporting to hold the position
of president, vice president, treasurer, clerk,
secretary, cashier, loan representative, principal,
investment, mortgage or other officer, agent, asset
manager, or other similar office or position, including
assistant to any such office or position, of the entity
holding such mortgage, or otherwise purporting to be an
authorized signatory for such entity, or acting under
such power of attorney on behalf of such entity, acting
in its own capacity or as a general partner or
co-venturer of the entity holding such mortgage, shall be
binding upon such entity and shall be entitled to be
recorded, and no vote of the entity affirming such
authority shall be required to permit recording.

Mass. Gen. Laws ch. 183, § 54B.

Second, strict compliance with the statutory notice of sale provision is "essential to the valid exercise of [the] power" of sale. Ibanez, 458 Mass. at 648 (quoting Moore, 187 Mass. at 212). Advance notice of the foreclosure sale must be provided to the mortgagor by registered mail and other interested parties by publication in a newspaper published or generally circulating in the town where the mortgaged property lies. Mass. Gen. Laws ch. 244, § 14; see Ibanez, 458 Mass. at 648. The failure to identify in the notice the present mortgagee may render the notice defective and the foreclosure sale void. Ibanez, 458 Mass. at 648. As noted, if the mortgage has been assigned, the assignment must be executed prior to the publication of the notice of sale. Id. at 651.

In addition to compliance with these two main requirements of the statute, a mortgagee seeking to foreclose must "act in

18

good faith and . . . use reasonable diligence to protect the
interests of the mortgagor." Id. at 467 n.16 (quoting Williams
v. Resolution GGF OY, 417 Mass. 377, 382-83 (1994)).  This duty
is heightened where the mortgagee is also the buyer at the
foreclosure sale.  Id.

### 2.   Unity of the Note and Mortgage

Under the "title theory" of mortgages, to which
Massachusetts adheres, a mortgage is a transfer of legal title to
a property for the purpose of securing a debt.  Ibanez, 458 Mass.
at 649.  Where a person borrows money to purchase a home and
gives the lender a mortgage, the homeowner-mortgagor retains only
equitable title; the lender-mortgagee holds legal title, subject
to the mortgagor's equitable right of redemption.  Id.; Adamson
v. Mortgage Elec. Registration Sys., Inc., No. 11-0693-H, 2011 WL
4985490, at *8 n.9 (Mass. Super. Ct. Oct. 19, 2011) (Brassard,
J.) (citing Hanna v. Framingham, 60 Mass. App. Ct. 420, 425 n.9
(2004)).

In Massachusetts, unlike many other jurisdictions, the
transfer of a note does not automatically transfer the mortgage
with it.  In re Marron, 455 B.R. at 6 (citing Barnes v. Boardman,
149 Mass. 106, 114 (1889) ("In some jurisdictions it is held that
the mere transfer of the debt without any assignment or even
mention of the mortgage, carries the mortgage with it, so as to
enable the assignee to assert his title in an action at law.

This doctrine has not prevailed in Massachusetts . . . .")
(internal citation omitted)).  Thus, different entities may hold
the mortgage and underlying note.  <u>Adamson</u>, 2011 WL 4985490, at
*8; <u>see</u> <u>Lamson & Co., Inc.</u> v. <u>Abrams</u>, 305 Mass. 238, 245 (1940).
Where the note and mortgage are split in this way, the mortgagee
is deemed to hold bare legal title to the mortgage in trust for
the note holder, who has an equitable right of assignment that
may be effectuated by filing a court action to require the
mortgagee to assign the mortgage to it.  <u>Ibanez</u>, 458 Mass. at
652; <u>Boruchoff</u> v. <u>Ayvasian</u>, 323 Mass. 1, 10 (1948) ("Ordinarily,
where a mortgage and the obligation secured thereby are held by
different persons, the mortgage is regarded as an incident to the
obligation, and, therefore, held in trust for the benefit of the
owner of the obligation."); <u>First Nat'l Bank of Cape Cod</u> v. <u>North
Adams Hoosac Sav. Bank</u>, 7 Mass. App. Ct. 790, 796 (1979) ("[T]he
transfer of a note which is secured by a mortgage is a valid
transaction with legal title to the mortgage document remaining
with the mortgagee in trust for the purchaser of the note who can
thereafter enforce in equity an assignment of the mortgage.").

The notion that a split of the debt and security interest
results in a trustee-beneficiary relationship between the holder
of legal title to the mortgage and the holder of the note, who
retains a beneficial interest in the mortgage, is longstanding.

In <u>Young</u> v. <u>Miller</u>, 6 Mass. (1 Gray) 152 (1856), the Supreme
Judicial Court held:

> When a party holds a mortgage to secure the payment of a
> single negotiable note only, and no formal assignment is
> made of the mortgage, and nothing to indicate an
> intention of the parties that it is not to be assigned;
> as the mortgagee and indorser of the note, after such
> indorsement, would hold only a barren fee, without
> beneficial interest, and as the mortgage accompanying the
> note would be highly beneficial to the indorsee for the
> security of his note, the law may well imply the
> intention of the parties that the mortgage is thenceforth
> to be held by the mortgagee in trust for the indorsee.
> In other words, such a transaction might manifest a
> resulting trust.

<u>Id.</u> at 154; <u>see</u> <u>Collins</u> v. <u>Curtin</u>, 325 Mass. 123, 125-26 (1949)
(holding that, by operation of law, a trust results where a
person "holds naked title for the benefit of another");
<u>Sturtevant</u> v. <u>Jacques</u>, 96 Mass. 523, 527 (1867) ("If the debt is
assigned without the mortgage, the mortgage is held in trust for
the assignee.").  The common law remains unchanged even today as
mortgage loans are pooled together in a trust and converted into
mortgage-backed securities.[7]  <u>See</u> <u>Ibanez</u>, 458 Mass. at 649.  The
underlying promissory notes serve as financial instruments

---

[7] "Put simply, securitization is the process of creating
debt instruments (usually bonds) by pooling mortgage loans,
transferring those obligations to a trust, and then selling to
investors fractional interests in the trust's pool of mortgages."
Katherine Porter, <u>Misbehavior and Mistake in Bankruptcy Mortgage
Claims</u>, 87 Tex. L. Rev. 121, 126 (2008).  For an extensive
discussion of securitization, see Timothy A. Frochle, <u>Standing in
the Wake of the Foreclosure Crisis: Why Procedural Requirements
are Necessary to Prevent Further Loss to Homeowners</u>, 96 Iowa L.
Rev. 1719, 1725-29 (2011).

generating a potential revenue stream for investors, but the
mortgages securing the notes are still legal title to the homes.
Id.  To foreclose, therefore, "the note holder must first
exercise its equitable right to obtain the mortgage through a
'valid written assignment . . . or a court order of assignment.'"
Kiah, 2011 WL 841282, at *4 n.6 (quoting Ibanez, 458 Mass. at
653).

    While the obligation of the note holder to obtain an
assignment of the mortgage prior to foreclosing is clear from the
plain language of the statutory power of sale, see Ibanez, 458
Mass. at 648, the Supreme Judicial Court has not yet resolved
whether the inverse is also required.  In other words, is a
mortgagee who holds only legal title without any interest in the
underlying debt authorized to foreclose?  This Court interprets
Massachusetts law to hold that a mortgagee who does not hold the
note or service the loan on behalf of the note holder cannot
foreclose the mortgage.

    Numerous courts have held that "Massachusetts law does not
require a unity of ownership of a mortgage and its underlying
note prior to foreclosure."  Rosa v. Mortgage Elec. Sys., Inc.,
No. 10-12141-PBS, 2011 WL 5223349, at *7 (D. Mass. Sept. 29,
2011) (Saris, J.) (adopting Report and Recommendations of
Collins, M.J.); see, e.g., Doust v. Wells Fargo Bank, N.A., No.
10-1882, slip op. (1st Cir. Oct. 31, 2011), available at ECF No.

42-1; <u>Archambault</u> v. <u>Aurora Loan Servs., LLC</u>, No. 11-cv-10373,
2011 WL 4062379, at *1 (D. Mass. Sept. 13, 2011) (Stearns, J.);
<u>In re Marron</u>, 455 B.R. at 7; <u>Aliberti</u>, 779 F. Supp. 2d at 249;
<u>McKenna</u> v. <u>Wells Fargo Bank, N.A.</u>, No. 10-10417-JLT, 2011 WL
1100160, at *2 (D. Mass. Mar. 21, 2011) (Tauro, J.); <u>Valerio</u> v.
<u>U.S. Bank, N.A.</u>, 716 F. Supp. 2d 124, 128 (D. Mass. 2010)
(Gorton, J.); <u>Carlson</u> v. <u>Wells Fargo Bank, N.A.</u>, No. 10-41291-
MSH, 2011 WL 3420436, at *6 (Bankr. D. Mass. Aug. 2, 2011); <u>Saxon
Mortg. Servs., Inc.</u> v. <u>Arazi</u>, No. 10 MISC 442037, 2011 WL
4790651, at *2 (Mass. Land Ct. July 12, 2011) (Piper, J.); <u>Lyons</u>
v. <u>Mortgage Elec. Registration Sys., Inc.</u>, No. 09 MISC.
416377(JCC), 2011 WL 61186, at *3 (Mass. Land Ct. Jan. 4, 2011)
(Cutler, J.); <u>cf. In re Huggins</u>, 357 B.R. 180, 184 (Bankr. D.
Mass. 2006) (holding that where a mortgagee is acting on behalf
of the note holder, "there is no disconnection between note and
mortgage," and the mortgagee may foreclose). <u>But see In re
Samuels</u>, 415 B.R. 8, 20 (Bankr. D. Mass. 2009) (assuming the
trustee must hold both the mortgage and the promissory note to
foreclose).

A recent Massachusetts Superior Court decision, <u>Eaton</u> v.
<u>Federal Nat'l Mortg. Ass'n</u>, No. 11-1382, slip op. (Mass. Super.
Ct. June 17, 2011) (McIntyre, J.) (appeal pending), <u>available at</u>
ECF No. 27, however, definitively concludes that only a mortgagee
who also holds the note or is servicing the loan on behalf of the

note holder may foreclose.  In concluding that a party without a claim to the debt cannot exercise the power of sale, the Eaton court relied on longstanding precedent of the Supreme Judicial Court, namely Wolcott v. Winchester, 81 Mass. 461 (1860), and Crowley v. Adams, 226 Mass. 582 (1917).  In Wolcott, the Supreme Judicial Court held that "the possession of the debt [is] essential to an effective mortgage, and . . . without it [one cannot] maintain an action to foreclose the mortgage."  Id. at 465.  More than fifty years later, the court reiterated in Crowley that "possession of the note [is] essential to an enforceable mortgage without which [no] mortgage could effectively be foreclosed."  Id. at 585.  Eaton interpreted these cases to mean that, although Massachusetts law allows for separation of the note and mortgage, they must be rejoined in the same entity or the entity's servicing agent before initiating foreclosure proceedings.  Eaton, 11-1382, slip op. at 4; see also Adamson v. Mortgage Elec. Registration Sys., Inc., No. 11-0693-H, 2011 WL 4985490, at *7-9 (Mass. Super. Ct. Oct. 19, 2011) (Brassard, J.) (concluding, on reconsideration of the issue in light of Eaton, that Wolcott "implies" and Crowley "provides some support" for the idea that the same entity must hold the note and mortgage to foreclose).

     At least one federal bankruptcy court judge has since declined to follow Eaton's interpretation of Wolcott and Crowley.

See In re Marron, No. 10-45395-MSH, 2011 WL 3800040, at *2

(Bankr. D. Mass. Aug. 29, 2011) (denying motion for

reconsideration of a grant of relief from automatic stay).

Remarking that both Wolcott and Crowley concerned loans that were

satisfied before the onset of the litigation, the In re Marron

court read these cases as demonstrative only of the fact that,

where the underlying debt has been paid in full by the mortgagor,

an action to foreclose the mortgage as security for the debt

cannot lie.[8]   Id. ("The reliance in Wolcott and Crowley on the

need for possession of the debt or note as a condition to

foreclosure was not in the context of whether the mortgagee held

the right to enforce the obligation, but whether anyone did.").

The In re Marron court thus considered Wolcott and Crowley

"inapposite" to the situation in which the indebtedness on a

mortgage loan remains outstanding.   In re Marron, 2011 WL

3800040, at *2.

    In re Marron missteps both factually and legally in its

analysis of the common law.   First, as matter of fact, it is at

---

    [8] See, e.g., Bevilacqua, 460 Mass. at 774 ("The title held
by a mortgagee is defeasible, and 'upon payment of the note by
the mortgagor . . . the mortgagee's interest in the real property
comes to an end.'" (quoting Maglione v. BancBoston Mortg. Corp.,
29 Mass. App. Ct. 88, 90 (1990))); Perry v. Oliver, 317 Mass.
538, 541 (1945) (holding that extinguishment of the debt entitles
the mortgagor to a surrender of the note and a discharge of the
mortgage); Geffen v. Paletz, 312 Mass. 48, 53 (1942) ("[A
mortgage] is a conveyance of real estate or some interest
therein, defeasible upon the payment of money . . . .").

most ambiguous whether the debt was in fact paid in full in
Wolcott.  See Wolcott, 81 Mass. at 464 (stating that "it is well
established that a mere outstanding naked mortgage title, the
debt having been paid, cannot avail the mortgagee, so as to
sustain an action upon the mortgage," but making no definitive
statement that the debt had been paid in that case).  Second, and
more significant from a legal standpoint, while both Wolcott and
Crowley state that a mortgage cannot be foreclosed where the
underlying debt has been discharged, this is but one application
– and perhaps the most "plain" and obvious one, Crowley, 226
Mass. at 585 – of the broader rule that a mortgagee must have a
valid claim to the debt before attempting foreclosure.[9]

---

[9] While Eaton, and subsequently Adamson, focused primarily
on Wolcott and Crowley as controlling precedent, the idea that a
holder of bare legal title to the mortgage cannot foreclose
without an accompanying interest in the note can be traced back
even further.  In Howe v. Wilder, 77 Mass. 267 (1858), the
Supreme Judicial Court held that a mortgagee, having sold and
transferred the note to another, not only "lost all right to
enforce the payment of [the note] to himself" but also "ha[d] no
equitable claim upon or right to disturb the mortgagor or
interrupt him in the possession and enjoyment of [the mortgaged
property]."   Id. at 269.  The court explained that

> if he should attempt anything of that kind, as by
> prosecuting a writ of entry for that purpose, he must
> necessarily fail to maintain his action. . . . For in
> pursuing such a suit he has only the rights of a
> mortgagee, and is limited by the restrictions imposed
> upon him. . . . If nothing is found due to [the note
> holder], it follows by necessary implication, from the
> provisions of the statute, that [the mortgagee] can
> recover no judgment at all; none to have possession at
> common law, because that is expressly prohibited . . . .

Requiring reunification of the note and mortgage prior to
the notice of sale arises logically as a rule from the fact that
a mortgage is "but an incident to the debt."  Eaton, No. 11-1382,
slip op. at 4 (quoting Perry v. Oliver, 317 Mass. 538, 541
(1945)); see General Ice Cream Corp. v. Stern, 291 Mass. 86, 89
(1935) ("The debt is the principal thing and the mortgage is
incident only."); Maglione v. BancBoston Mortg. Corp., 29 Mass.

---

Id.

One year prior to Howe, the predecessor statute to
Massachusetts General Laws chapter 244, section 14, took effect.
See St. 1857, ch. 299, § 1.  This 1857 statute used the term
"mortgagee" without reference to the holder of the note:

> In all cases, in which a power of sale is contained in a
> mortgage deed of real property, the mortgagee, or any
> person having his estate therein, or in or by such power
> authorized to act in the premises, may, upon a breach of
> the condition thereof, give such notices and do all such
> acts as are authorized or required by such power . . . .

Id.  The Supreme Judicial Court's decision in Howe thus appears
to have interpreted the 1857 statute's use of "mortgagee" to mean
holder of both the mortgage and note.  Because the present-day
language of the statutory power of sale is materially the same as
St. 1857, ch. 299, § 1, the interpretation read into the statute
by the Howe court ought continue to apply today.

Moreover, chapter 244 of the Massachusetts General Laws, as
a whole, uses the term "mortgagee" interchangeably with "the
holder of a mortgage note."  See Mass. Gen. Laws ch. 244, § 17B
(notice of mortgagee's intention to foreclose and of mortgagor's
liability for post-foreclosure deficiency); see also id. § 19
(equitable right of redemption); id. § 20 (accounting); id. § 23
(order for payment); id. § 36 (recovery of post-foreclosure
surplus by mortgagor).  "The use of the term mortgage note when
modern parlance would call for promissory note reflects a common
understanding of generic terms, back when the statute was
enacted."  Eaton, No. 11-1382, slip op. at 7-8.  Reading these
statutory provisions together evinces the legislative intent that
only a mortgagee also holding the note be authorized to exercise
the power of sale.

27

App. Ct. 88, 90 (1990) ("Although a mortgage vests [legal] title
[in the mortgagee], that title is defeasible and is an off-shoot
of the underlying debt.").  A mortgage, by virtue of being a
security interest only, "is of no value as property" when
detached from the debt that it is intended to secure.  Eaton, No.
11-1382, slip op. at 4 (quoting Sanger v. Bancroft, 78 Mass. 365,
367 (1859)); see Kinney v. Stevens, 207 Mass. 368, 370 (1911)
(holding that the note and the mortgage "must coexist to give the
mortgage validity").  Contrary to the suggestion of the
bankruptcy court in In re Marron, foreclosure of a mortgage does
not become impossible only when the debt has been extinguished;
rather, "[a] mortgage cannot be made available without connecting
it with the debt or duty secured thereby."  Sanger, 78 Mass. at
367 (emphasis added).

Were a mortgagee without an interest in the debt able to
exercise the power of sale, the note would be left outstanding as
a valid obligation of the mortgagor to its holder.  Cf.
Cooperstein v. Bogas, 317 Mass. 341, 344 (1944) (recognizing
double liability as a concern in a reach and apply case).  "[T]he
holder of the note could attempt to collect on the note after the
mortgage was foreclosed subjecting the mortgagor to double
liability."  Adamson, 2011 WL 4985490, at *9; see Residential
Funding Co., LLC v. Saurman, Nos. 290249, 291443, slip op. at 9
(Mich. Ct. App. Apr. 21, 2011), available at http://coa.courts.

28

mi.gov/documents/OPINIONS/FINAL/COA/20110421_C290248_94_290248.OP

N.PDF ("[I]f [a mortgagee who does not hold the note] were

permitted to foreclose on the properties, the borrowers obligated

under the note would potentially be subject to double-exposure

for the debt.  That is, having lost their property to [the

mortgagee], they could still be sued by the noteholder for the

amount of the debt because [the mortgagee] does not have the

authority to discharge the note."); see also Livonia Props.

Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC, 399 F.

App'x 97, 102 (6th Cir. 2010) (suggesting that where the

foreclosing entity does not own the indebtedness, the borrower is

at risk of double liability on the loan); Tate v. BAC Home Loan

Servicing, LP, No. 10-13257, 2011 WL 3957554, at *4 (E.D. Mich.

Aug. 5, 2011) (same); Stein v. U.S. Bancorp, No. 10-14026, 2011

WL 740537, at *11 (E.D. Mich. Feb. 24, 2011) (same); 5-Star

Mgmt., Inc. v. Rogers, 940 F. Supp. 512, 520 (E.D.N.Y. 1996) ("To

allow the assignee of a security interest to enforce the security

agreement would expose the obligor to a double liability, since a

holder in due course of the promissory note clearly is entitled

to recover from the obligor." (quoting In re Hurricane Resort

Co., 30 B.R. 258, 261 (Bankr. S.D. Fla. 1983))); cf. NattyMac

Capital LLC v. Pesek, 784 N.W.2d 156 (S.D. 2010) (where the loan

servicer failed to meet its duty to forward the loan payoff to

the note holder, the note holder then sought a declaratory

29

judgment against the new homeowners that the satisfaction of the mortgage was a nullity and that its mortgage remained in effect); Washington Mut. Bank, F.A. v. Green, 806 N.E.2d 604, 609 (Ohio Ct. App. 2004) (the defendant adduced facts sufficient to survive summary judgment showing that the plaintiff was not the real party in interest in foreclosing her mortgage).

Arguably, the mortgagee, as trustee, would have a fiduciary duty to account to the note holder for the proceeds of a foreclosure sale - thereby alleviating the concern of double liability.  See In re Marron, 455 B.R. at 7.  But this assumes, perhaps incorrectly, that, where the law implies a resulting trust, the trustee may take affirmative steps on behalf of the trust's beneficiary, as opposed merely to hold the trust property.  Case law suggests that such action is outside the scope of authority granted to the trustee of an equitable trust. See Roche v. Roche, 22 Mass. App. Ct. 306, 310 (1986) ("Implied trustees . . . do not fit plausibly in a representative capacity. Theirs is not a position of fiduciary responsibility.  The customarily applicable word of 'imposing' a constructive trust or resulting trust signals the remedial nature of the concepts."); cf. In re Bologna, 206 B.R. 628, 632 (Bankr. D. Mass. 1997) (stating that, under federal law, "fiduciary capacity" is limited to "the capacity of one who holds property under either an express trust or . . . a technical trust, but not under a trust

30

imposed by law as a remedy, as a constructive trust, an implied
trust, or a trust ex maleficio"). Moreover, even assuming a
trustee-mortgagee may exercise the power of sale in a fiduciary
capacity, an obligation on the part of the trustee-mortgagee to
remit the foreclosure sale proceeds to the note holder still
would fall short of the guarantee to which the mortgagor is
entitled: "[i]f the proceeds of the sale equal or exceed the
amount due on the note, both principal and interest, [the note
holder] cannot have judgment in [an] action on the note, for the
debt is paid." Draper v. Mann, 117 Mass. 439, 441 (1875); cf.
Mass. Gen. Laws ch. 183, § 55(c)(1)(I). Foreclosure of a
mortgage by an entity without the power to discharge the debt
secured by that mortgage would create a degree of uncertainty as
to the mortgagor's remaining liability that this Court is
unwilling to condone.

Therefore, unless the Supreme Judicial Court decides
otherwise in Eaton v. Federal Nat'l Mortg. Ass'n, SJC-11041
(argued and taken under advisement on October 3, 2011), this
Court, in agreement with two justices of the Massachusetts
Superior Court, Adamson, 2011 WL 4985490, at *7; Eaton, No. 11-
1382, slip op. at 9, reads the law as requiring a mortgagee to
possess the legal title to the mortgage and either hold the note
or establish that it is servicing the loan on behalf of the note
holder.

31

B.    MERS and the Standard MERS Mortgage Contract

At the outset, this Court must acknowledge Aurora's assertion that Culhane lacks standing to question MERS's involvement in the chain of legal title here.  Aurora argues (correctly) that Culhane expressly agreed to the transfer of bare legal title to MERS and its successors and assigns, see Mortgage 1, and that neither MERS nor Aurora itself has raised any issue whatsoever as to the assignment of that legal title from MERS to Aurora.  This, however, hardly resolves the issue of Culhane's standing.

As will be detailed below, running the legal title through MERS (as opposed simply to registering such title on the MERS registry) creates a cloud on the title which may expose subsequent purchasers to adverse claims, see Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034, 1039 (9th Cir. 2011), and thus reduces the value of the subject property, which, in turn, could well expose Culhane to a greater deficiency judgment upon foreclosure.  This establishes her standing to challenge MERS's involvement here.

MERS is the Wikipedia of land registration systems.  A Delaware corporation headquartered in Virginia, it was created in 1993 along with its parent corporation MERSCORP, Inc. ("MERSCORP") by major players in the residential mortgage market to track ownership interests in mortgage loans.  In re Marron,

455 B.R. at 3; MERSCORP, Inc. v. Romaine, 8 N.Y.3d 90, 96 & nn.2-3 (2006).  MERS maintains an electronic registry that stores information as to who originates, services, and owns mortgage loans.  In re Marron, 455 B.R. at 4.  By maintaining this registry, MERS, despite its small size of sixty-five employees and self-described "back office" operation, has a hand in sixty percent of the nation's residential mortgages.  Austin Kilgore, The New Man at MERS, Mortg. Tech., Sept. 2011, at 13-14, available at www.nationalmortgagenews.com/pdfs/MTSeptember2011.pdf.  In the future, "MERS hopes to register every residential and commercial home loan nationwide on its electronic system." Romaine, 8 N.Y.3d at 101 (Kaye, C.J. dissenting).

      Mortgage lenders, loan servicers, law firms, title companies, banks, and insurance agencies become "members" of MERS by paying annual fees and consenting to the MERS Rules and Terms and Conditions.  In re Marron, 455 B.R. at 3-4; Jackson v. Mortgage Elec. Registration Sys., Inc., 770 N.W.2d 487, 490 (Minn. 2009); Romaine, 8 N.Y.3d at 96 (majority opinion). Membership permits access to the MERS registry.  Rosa, 2011 WL 5223349, at *3.  In fact, it is the responsibility of MERS's members to update the registry to reflect the transfer of the beneficial interests in and servicing rights to mortgage loans. MERS Rule 2, § 3.  MERS does not input any of the information in its registry and makes no representations or warranties regarding

33

its accuracy or reliability.   MERS ServicerID User Guide 1 (Dec.
18, 2006), <u>available at</u> www.mersinc.org/files/filedownload.aspx?
id=249&table=ProductFile.

MERS members agree to name MERS as "mortgagee of record" in
the appropriate public registry of deeds with respect to any
mortgage that they register on the MERS database.   MERS Rule 2, §
5(a); Terms & Conditions ¶ 2.   "MERS is named as mortgagee of
record in the mortgage so that beneficial ownership and servicing
rights of the note may be transferred among MERS members without
the need to publicly record such assignments; instead assignments
of the note are tracked by MERS' electronic system."   <u>Rosa</u>, 2011
WL 5223349, at *3; <u>Jackson</u>, 770 N.W.2d at 490.   So long as the
note is held by a MERS member or the loan is serviced by a MERS
member, no matter how many times it is transferred between
members, MERS remains the mortgagee of record.[10]   <u>Kiah</u>, 2011 WL
841282, at *1 n.1; <u>In re Agard</u>, 444 B.R. 231, 248-49 (Bankr.
E.D.N.Y. 2011).   In practice, this means that "[m]embers
contractually agree to appoint MERS to act as their common agent
on all mortgages they register in the MERS system."   <u>Romaine</u>, 8
N.Y.3d at 96.

_____

   [10] If a note is transferred to a non-MERS member, then MERS
will assign the mortgage to the new holder, unless that holder's
loan servicer is a MERS member, in which case MERS will continue
to be mortgagee of record.   <u>See</u> <u>In re Moreno</u>, No. 08-17715-FJB,
2010 WL 2106208, at *1 (Bankr. D. Mass. May 24, 2010); MERS Rule
4(a)-(b).

The standard MERS mortgage contract, like Culhane's, defines MERS as "the mortgagee under this Security Instrument."  See Mortgage 1.  It also states, however, that "MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns," with the term "lender" referring to the note holder.  Id.  MERS thus serves "as the mortgagee of record with respect to . . . mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time."  Terms & Conditions ¶ 2.

Courts and scholars alike have expressed reservation, even bewilderment, as to MERS's claim to be both mortgagee and nominee or, as it has been generalized, both principal and agent.  See, e.g., In re Agard, 444 B.R. at 254 ("MERS's position that it can be both the mortgagee and an agent of the mortgagee is absurd, at best."); Bailey, 460 Mass. at 328 n.3 ("In this case, we are not faced with the issue whether MERS may properly be both the mortgagee and an agent of the mortgagee, and we do not decide in which capacity MERS acted here."); Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 165-66 (Kan. 2009) (stating that MERS defines its role "in much the same way that the blind men of Indian legend described an elephant - their description depended on which part they were touching at any given time"); Christopher L. Peterson, Two Faces: Demystifying the Mortgage Electronic Registration

System's Land Title Theory, 53 Wm. & Mary L. Rev. 111, 118 (2011)
("On the one hand, MERS purports to act purely as a 'nominee'- a
form of an agent.  On the other hand, MERS also claims to be an
actual mortgagee, which is to say an owner of the real property
right to foreclose upon the security interest.  That a company
cannot be both an agent and a principal with respect to the same
right is axiomatic."); Nolan Robinson, Note, The Case Against
Allowing Mortgage Electronic Registration Systems, Inc. (MERS) to
Initiate Foreclosure, 32 Cardozo L. Rev. 1621, 1643-44 (2011)
("Despite MERS's success in the courtroom, however, . . . basic
principles of agency support the claim that MERS should not, in
fact, have legal standing to foreclose in this scenario. . . .
[A]n agent cannot augment the power of its principal, nor can a
principal grant rights to an agent that the principal does not
itself possess.").  In this Court's view, and as counsel for
Aurora has so ably argued, see Hr'g Tr. 25-26, the notion that
MERS is pejoratively "two-faced" derives from a legal premise
that is faulty in its understanding of MERS's interest in the
mortgage.

36

MERS readily concedes that it does not own mortgage loans[11] and "has no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans." Terms & Conditions ¶ 2. The standard MERS mortgage contract does not suggest otherwise:

> This Security Instrument secures to Lender: (I) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property . . . .

> Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

Mortgage at 2-3. By the very terms of the mortgage instrument, MERS holds only bare legal title to each mortgage registered on its system. Consistent with its status as holder of bare legal

---

[11] Despite never owning the promissory note, MERS used to permit its members to conduct foreclosure proceedings in its name, in which case MERS was "identified as the 'note-holder' but only if the note [was] endorsed in blank and [was] in possession of a person authorized by MERS and the member to sign on MERS' behalf." In re Marron, 455 B.R. at 4 n.5. As of July 22, 2011, however, MERS no longer authorizes the filing of foreclosure actions in its name and in fact will levy sanctions against members who nonetheless do so. See MERS Rule 8(d).

title to the mortgage, MERS further agrees to act at the
direction of the note holder, who retains a beneficial interest
in the mortgage.  Terms & Conditions ¶ 3; MERS Rule 2, § 6.
Thus, MERS is hardly a principal; at most, it is an agent.  See
Fontenot v. Wells Fargo Bank, N.A., 129 Cal. Rptr. 3d 467, 481
(Cal. Ct. App. 2011) (stating there is "nothing inconsistent"
about MERS "exercis[ing] the rights and obligations of a
[mortgagee] . . . as an agent for the lender, not for its own
interests").

The term "nominee" in fact connotes a narrow form of agency:
a "person designated to act in place of another, usu[ally] in a
very limited way." Black's Law Dictionary (9th ed. 2009).  The
MERS Rules likewise define "nominee" as a "limited agent," MERS
Rule 8(b), although this appears to be a recent addition, see In
re Agard, 444 B.R. at 252 (stating that the section of the MERS
Rules identified by MERS, an intervenor in that action, as
establishing its role as the note holder's agent "contains no
explicit reference to the creation of an agency or nominee
relationship").  Perhaps even more fitting to describe MERS's
role in the mortgage transaction is the second definition of
"nominee" given in Black's Law Dictionary: a "party who holds
bare legal title for the benefit of others." Black's Law
Dictionary; see Mortgage Elec. Registration Sys., Inc. v.
Saunders, 2 A.3d 289, 295 (Me. 2010).  By holding bare legal

title to mortgages for the purpose of recording them in its name,
MERS allows for the underlying notes, which carry with them the
beneficial interests in the mortgages, to be transferred freely
and without clouding title.   See Cervantes, 656 F.3d at 1039.

As discussed above, the common law of Massachusetts permits
the practice of splitting the mortgage from the debt that it
secures (at least prior to foreclosure).   Such a split results in
the mortgagee holding legal title to the mortgage in trust for
the note holder, who has an equitable right to obtain an
assignment of the mortgage.   The mortgagee is thus a mortgagee in
a nominal sense only; its rights are limited by its obligation as
trustee.   This is precisely the same scenario created by the
standard MERS mortgage contract, irrespective of its use of the
term "nominee" over "trustee."[12]   Thus, the law is held to imply

---

[12] There may be yet a third reason that "nominee" is the
term of choice in the standard MERS mortgage contract.   In
Massachusetts, a nominee trust is "a common device for holding
title to real estate."  Vitands v. Sudduth, 49 Mass. App. Ct.
401, 408 n.11 (2000).   While it vests legal title to the trust
property in the trustee, the trustee is deemed to hold the
property for the trust's beneficiaries, who exercise the
controlling powers.  Id.; see Morrison v. Lennett, 415 Mass. 857,
860 (1993) (defining "nominee trust" as "an entity created for
the purpose of holding legal title to property with the trustee[]
having only perfunctory duties" (quoting Johnston v. Holiday
Inns, Inc., 595 F.2d 890, 893 (1st Cir. 1979))).   The trustee of
a nominee trust possesses "only the barest incidents of
ownership," Morrison, 415 Mass. at 861, and "ha[s] no power, as
such, to act in respect of the trust property, but may only act
at the direction of (in effect, as agents for) the
beneficiaries," In re Grand Jury Subpoena, 973 F.2d 45, 48 (1st
Cir. 1992).   The trustee is "frequently seen as [an] agent[] for
the principals' convenience rather than as [a] trustee[] in the

a trustee-beneficiary relationship between MERS and the note

holder.  See Rosa, 2011 5223349, at *4; Kiah, 2011 WL 841282, at

*4; In re Marron, 455 B.R. at 6; Mack v. Wells Fargo Bank, N.A.,

No. WOCV201002228, 2011 WL 4837261, at *4 (Mass. Super. Ct. Aug.

31, 2011) (Moriarty, J.); Deutsche Bank Nat'l Trust Co. v.

Ciccheli, Nos. 10 MISC. 423350(AHS), 10 MISC 436809(AHS), 2011 WL

3805905, at *5 (Mass. Land Ct. Aug. 24, 2011) (Sands, J.).

        It is as if by clever design that the MERS system fits

perfectly into the Massachusetts model for the separation of

legal and beneficial ownership of mortgages.  See In re Marron,

455 B.R. at 6 n.7 (noting that jurisdictions that do not permit

---

more familiar fiduciary sense." Roberts v. Roberts, 419 Mass.
685, 688 (1995) (quoting Apahouser Lock & Sec. Corp. v. Carvelli,
26 Mass. App. Ct. 385, 388 (1988)); see Zoppo v. Zoppo, 453 F.
Supp. 2d 232, 234 (D. Mass. 2006) (Tauro, J.) ("[N]ominee trusts
are defined by total control of the present beneficiary, with the
trustee simply an agent obligated to hold the property."); Zuroff
v. First Wis. Trust Co., 41 Mass. App. Ct. 491, 493 n.3 (1996)
(holding that the trustee of a nominee trust "function[s] more as
an agent than as a true trustee").  The beneficiaries have the
right to "terminate the trust at any time, thereby receiving
legal title to the trust property as tenants in common in
proportion to their beneficial interests."  In re Grand Jury
Subpoena, 973 F.2d at 48.
        The hybrid agent-principal/trustee-beneficiary relationship
created by a nominee trust is identical to that between MERS and
the note holder under the standard MERS mortgage contract.  In
light of this, the use of the term "nominee" in the standard MERS
mortgage contract seems even more intentional.  But this Court
need not decide whether the mortgage contract is an instrument
sufficient to create a nominee trust.  Even were the Court to
hold that the standard MERS mortgage contract fails as a
declaration of trust, the law nonetheless implies a trust because
of the split of the note and mortgage.  Practically speaking, the
result is the same.

such separation "understandably find [the MERS system] a
challenge which may account for the inconsistency in [judicial]
decisional authority").  But the fact that MERS's status as
mortgagee in a nominal capacity for the note holder comports with
Massachusetts law is only the first step.

     At issue in this case is MERS's power to assign the
mortgage.  The prevailing view in Massachusetts is that MERS has
the power of assignment by virtue of its nominee status.  See,
e.g., In re Marron, 455 B.R. at 7; Aliberti, 779 F. Supp. 2d at
249; Kiah, 2011 WL 841282, at *8; see also Randle v. GMAC Mortg.,
LLC, No. MISC 408202 (GHP), 2010 WL 3984714, at *7 (Mass. Land
Ct. Jan. 4, 2011) (Piper, J.) (accepting validity of assignment
by MERS without question as to its authority); Amtrust Bank v.
T.D. Banknorth, N.A., No. 07 Misc. 350750 (KCL), 2010 WL 1019638,
at *2 n.2 (Mass. Land Ct. Mar. 22, 2010) (Long, J.) (same).
These courts have focused on the agency relationship inherent in
MERS's designation as nominee.  See Kiah, 2011 WL 841282, at *4
(holding that MERS's "power to act as the agent of any valid note
holder" includes the power to assign).

     Moreover, although the standard MERS mortgage contract does
not explicitly mention the power of assignment, it gives MERS, as
nominee, the right "to exercise any of all of [the note holder's]
interests," including, but not limited to, the rights to
foreclose, release, and cancel the mortgage.  Mortgage 3.

Finally, in its Rules, MERS agrees to assign a mortgage that it holds as mortgagee of record "[u]pon request from the Member . . . where the Member is also the current promissory note-holder." MERS Rule 3, § 3.[13]  Accepting that MERS is a limited agent of the note holder, that the mortgage instrument grants specific authorization to MERS to exercise all the rights of the note holder, and that MERS agrees to make an assignment only at the request of the note holder, MERS ought be able to exercise the power of assignment.

There is, however, an important caveat to MERS's authority to act on behalf of the note holder, a caveat stated explicitly in the mortgage contract.  MERS, as nominee, may only exercise the rights of the note holder "if necessary to comply with law or custom."  Mortgage 3.  Thus, for MERS to take any action for the benefit of the note holder, including an assignment of the mortgage, the law must require, not merely permit, it.

Under Massachusetts General Laws chapter 183, section 21, an entity seeking to foreclose must hold the mortgage, although it

---

[13] Because MERS no longer authorizes the filing of foreclosure proceedings in its name, the MERS Rules now require a pre-foreclosure "assignment of the Security Instrument from MERS to the note owner's servicer, or to other such party expressly and specifically designated by the note owner."  MERS Rule 8, § 1(a).  Furthermore, "[t]he Member agrees and acknowledges that MERS has the authority to execute such assignment of the Secuirty Instrument. . . ."  Id.  Because this version of the Rules was not in effect at the time that MERS assigned Culhane's mortgage to Aurora, the Court does not consider it.

need not be recorded, prior to issuing the notice of sale, <u>see</u>
<u>Ibanez</u>, 458 Mass. at 647, and under this Court's reading of the
common law, that entity also must be entitled to enforce payment
of the debt secured by the mortgage.  MERS has disavowed any
interest in the debt, including the right to receive payment or
otherwise service the loan.  Even to the extent MERS is an agent
of the note holder, its rights and duties concern only legal
title to the mortgage, not the note or beneficial interest in the
mortgage.  <u>See</u> <u>Saunders</u>, 2 A.3d at 295.  Without a claim to the
underlying debt, MERS therefore cannot exercise the power of
sale, regardless of the language in the mortgage contract giving
it this power.  <u>See</u> <u>Saurman</u>, Nos. 290249, 291443, slip op. at 11.
 That the mortgagor consented to this contractual language does
not operate as a waiver of the law's protection against
foreclosure by the wrong entity.  <u>Cf.</u> <u>Henry</u> v. <u>Mansfield Beauty</u>
<u>Acad., Inc.</u>, 353 Mass. 507, 511 (1968) (Wilkins, C.J.) (holding
that a party may not contract away the protection that a statute
is intended to afford him, nor may the other party to the
contract exempt itself from its duty to comply with such
statute).

    Yet, it cannot be that no party may exercise the power of
sale.  As discussed, the note holder or its loan servicer may
foreclose, so long as it first asserts "its equitable right to
obtain the mortgage through a 'valid written assignment . . . or

43

a court order of assignment.'" <u>Kiah</u>, 2011 WL 841282, at *4 & n.6
(quoting <u>Ibanez</u>, 458 Mass. at 652-53).  Thus, where a mortgagee
holds legal title to the mortgage in trust for the note holder,
and where the note holder desires to foreclose, "law or custom"
in fact <u>necessitates</u> that, prior to initiating foreclosure
proceedings, the mortgagee must assign its interest to the note
holder or the note holder's servicing agent.  <u>See</u> <u>Geffen</u> v.
<u>Paletz</u>, 312 Mass. 48, 56 (1942).  The power to assign the
mortgage's legal title to its beneficial owner is arguably the
one power that must be bestowed on a mortgagee who holds only
legal title.  Because the mortgagee holds the title in trust for
the note holder, it may transfer that title only at the note
holder's request or by decree of court.  In this sense, the
mortgagee's power of assignment is more akin to a duty that it
owes as trustee.  But, regardless whether it is best termed a
power or a duty, equity requires that the holder of bare legal
title to a mortgage have the capacity to assign it to the note
holder or the note holder's loan servicer, so that a valid
foreclosure may be effectuated.  This analysis does not change
because the mortgagee is MERS.

    In sum, despite the standard MERS mortgage contract
expressly granting MERS, as nominee, the power to exercise the
rights of the note holder, including the power of sale, MERS
cannot foreclose in its own name because it has no claim to the

44

underlying debt.   Relatedly, because only the real party in interest may foreclose, it is "necessary to comply with law or custom" that MERS be capable of assigning the mortgage's legal title to its beneficial owner.   These are the two distinct, but ultimately harmonious, results produced by the common law rule requiring unity of the note and mortgage prior to foreclosure.

Having established that an assignment of the mortgage from MERS to the note holder not only comports with Massachusetts law, but also is in fact required by it if the note holder wishes to foreclose, the actual procedure by which MERS makes such an assignment must adhere to the requirements of Massachusetts General Laws chapter 183, section 54B.   As discussed, the statute provides that a mortgage assignment is binding and recordable if undertaken before a notary public "by a person purporting to hold the position of president, vice president, treasurer, clerk, secretary . . . or other similar office or position, including assistant to any such office or position, of the entity holding such mortgage, or otherwise purporting to be an authorized signatory for such entity . . . ."   Mass. Gen. Laws ch. 183, § 54B.   Proof of the signer's actual authority to act on behalf of the mortgagee is not required; nor must the signer attest to truth and accuracy of the assignment or his personal knowledge thereof.

While these statutory requirements are hardly burdensome, the cleverness of MERS's design to meet them is again inescapable.  Upon request by a member, MERS furnishes a formal corporate resolution designating one or more of the member's employees, chosen by the member, as "certifying officers" of MERS.  MERS Rule 3, § 3.  That is, MERS authorizes employees of the note holder or, more commonly, the note holder's servicing agent to execute assignments on MERS's behalf.  See Aliberti, 779 F. Supp. 2d at 249.  These employees are deputized at their own election as either "vice presidents" or "assistant secretaries" of MERS, and the actions that they may take as MERS's agents are enumerated in the corporate resolution.  See MERS's Mem. 7; see also Corporate Resolution.

At least until recently, none of MERS's sixty-five actual employees even needed to be involved in this process of appointing certifying officers.  Instead, the MERS member seeking the assignment from MERS would enter the names of its selected employees "into MERS's Web site, and, in a blink, MERS produced a 'certifying resolution,' signed by [its senior vice president]." Michael Powell & Gretchen Morgenson, MERS? It May Have Swallowed Your Loan, N.Y. Times, Mar. 6, 2011, at BU; see MERS Training Bulletin No. 2010-03, Re: Certifying Officer Certification Process (Mar. 2, 2010), available at http://www.mersinc.org/

files/filedownload.aspx?id=625&table=ProductFile.  The deputized

employees then were free to use MERS's corporate seal for a fee

of twenty-five dollars.  Powell & Morgenson, <u>supra</u>.  While MERS

claims to have instituted a new process for "test[ing] and

appoint[ing]" certifying officers, as far as this Court can

ascertain, the onus remains on MERS members to ensure that its

employees are "validly appointed" and "appropriate[ly] train[ed]

to carry out their duties and responsibilities as Certifying

Officers."  MERS Announcement Bulletin No. 2011-01, Re:

Foreclosure Processing and CMRS (Feb. 16, 2011), <u>available at</u>

http://www.mersinc.org/files/filedownload.aspx?id=678&table=Produ

ctFile.

The titles and powers assigned to the individuals who become

MERS's certifying officers are confounding given that these

individuals are not actually connected to MERS in any way.

> That MERS can consider an individual who is not an
> employee of the company, has never been to the company's
> location, does not know where the company is located, has
> never met the company's president, does not know who the
> president is, and has never communicated personally with
> the company in any way to be a vice president of that
> company is inconsistent with even the most expansive
> definition of the term <u>vice president</u>.  It does not
> follow that because a belief is convenient it is also
> true.

Peterson, <u>supra</u>, at 146 (emphasis added) (citing testimony given

in a foreclosure case by an employee of a Florida debt collection

law firm, who, as a MERS certifying officer, would sign twenty to

forty mortgage assignments per day on MERS's behalf).

> Perhaps the designation of servicer and law firm
> employees as assistant secretaries of MERS is less
> absurd, but it is still misleading.  While many of these
> servicer and law firm employees are secretarial workers
> in the businesses that they actually work for, they are
> not assistant secretaries of MERS in any meaningful
> economic sense.  They have no more contact with MERS than
> vice presidents do.  Indeed, the fact that MERS's
> boilerplate resolutions allow the employees to just pick
> which title they want to use is compelling evidence that
> the whole concept is twaddle.

Id.

This Court is deeply troubled that, with little to no oversight, individuals without any tie to or knowledge of the company on whose behalf they are acting may assign mortgages - that is, they may transfer legal title to someone else's home. Cf. Jenifer B. McKim, Building an Empire, One Home at a Time, Bos. Globe, Aug. 7, 2011.  Equally troubling is the conflict of interest posed by these certifying officers wearing "two hats" simultaneously: that of assignor (as agent for MERS) and assignee (as employee of the note holder or its servicing agent).  See James v. Recontrust Co., No. CV-11-CV-324-ST, 2011 WL 3841558, at *12 (D. Or. Aug. 26, 2011).  Indeed, a MERS certifying officer is more akin to an Admiral in the Georgia navy or a Kentucky Colonel with benefits than he is to any genuine financial officer.  In its rush to cash in on the sale of mortgage-backed securities, the MERS system supplies the thinnest possible veneer of

formality and legality to the wholesale marketing of home
mortgages to large institutional investors.[14]

But what of it?  MERS's certifying officers "purport[] to
hold the position of . . . vice president, . . . secretary, . . .
[or] assistant to . . . such office or position."  Mass. Gen.
Laws ch. 183, § 54B.  That they hold themselves out as officers
of MERS, the "entity holding [the] mortgage," is all that the
statute requires with respect to a signer's authority.  Id.  The
corporate resolution, however auto-generated, does give them
actual authority to act on MERS behalf.  Indeed, this is
immaterial.  Even without it, their assignments would be "binding
upon [MERS] . . . [and] entitled to be recorded."  Id.; see Kiah,
2011 WL 841282, at *7 (holding that, even if the individual who
signed the mortgage assignment lacked the authority to do so, the
assignment would still be binding on MERS because he purported to
be authorized); In re Marron, 2011 WL 3800040, at *3 ("Though
there appear to be no cases interpreting § 54B, its plain
language establishes that the assignments in this case are
binding upon MERS whether or not MERS or its signing officer had
the authority to execute them."); Mack, 2011 WL 4837261, at *5

---

[14] It is only fair to point out that there is utterly no
evidence of fraud or impropriety here in Culhane's case.  Indeed,
even after the most careful scrutiny, it appears that MERS works
rather well as a land registration system.  Questions are raised
because it purports to hold legal title when "there's no there,
there."

("[N]either MERS nor the assignee must prove the authority of the

signatories."). This Court can discern no way in which MERS's

procedure for assigning mortgages contradicts the letter of

Massachusetts General Laws chapter 183, section 54B.[15]

_____

[15] Interestingly, were this motion to have been heard in the
courts of the Commonwealth, the outcome could well be different.
It is not the law that is different; it is the differing
responsibilities and authority of our federal and state courts.
   As a judge of the United States exercising this Court's
diversity jurisdiction, my duty is to declare the law of
Massachusetts as it is, and my focus is, and must remain, on the
statutes of the Commonwealth and the decisions of its courts,
nothing more.
   The courts of general jurisdiction of the Commonwealth of
Massachusetts (i.e., the Superior Court, the Appeals Court, and
the Supreme Judicial Court), however, are common law courts,
empowered to devise a remedy for every legally cognizable wrong.
The justices of those Massachusetts courts necessarily must
exercise a much wider focus and a broader vision to the end that
"[e]very subject of the Commonwealth [will] find a certain
remedy, by having recourse to the laws, for all injuries or
wrongs which he may receive in his person, property, or
character." Mass. Const. pt. 1, art. XI.
   This Court admits that, for a time, it was conceptually
bemused by MERS, for MERS represents a complex web of rights and
interests, some sounding in law and others in equity; of roles
such as agent, nominee, and trustee, which often but do not
always overlap; of entities, some of whom are dual players while
others exist only on paper. At its core, it is a system designed
by the banks' lawyers to grow the securitization industry. In
this it has been remarkably successful. Securitization has
replaced financial institutions in funding home mortgage loans,
with over eighty percent of all such loans originated in 2006 -
the year Culhane took out her mortgage - having been securitized.
See James R. Barth et al., Milken Inst., A Short History of the
Subprime Mortgage Market Meltdown 5 fig. 2 (2008), available at
http://www.milkeninstitute.org/publications/publications.taf?func
tion=detail&ID=38801038&cat=Papers. A closer look at the larger
securitization process reveals a system apparently intended to
raise a virtually impenetrable smokescreen to the detriment of
homeowners and the communities where they live.
   Slicing and dicing a home mortgage transaction as was done
here profoundly alters the economic incentives of the banking

industry in the home mortgage market.  Banks necessarily focus on
the immediate cash return from securitizing their home mortgage
loans, rather than relying upon them as long term investments.
Their agents, the loan servicers, have little, if any, incentive
to "work out" a troubled home mortgage loan and every incentive
to realize an immediate return from foreclosure sales.  Moreover,
one who holds bare legal title, without more, has no incentive
whatever to maintain the home it owns.  Consider:

Where a mortgage loan has been pooled with others in a trust
that then issues mortgage-backed securities to investors, the
holder of the note is the trustee on behalf of the investors, who
are the real beneficial owners.  The trustee's role is to
distribute to the investors the principal and interest payments
by the mortgagors whose loans make up the trust.  Yet, neither
the trustee nor the investors are in the business of servicing
the trust pool's loans.  The trustee therefore contracts with a
loan servicer, like Aurora in this case, who specializes in the
day-to-day management of mortgage loans, including debt
collection, loan restructuring, and foreclosure.  The servicer is
to manage the loans for the benefit of the investors.  See
generally Adam J. Levitin & Tara Twomey, Mortgage Servicing, 28
Yale J. on Reg. 1, 13-16 (2011); Christopher L. Peterson,
Predatory Structured Finance, 28 Cardozo L. Rev. 2185, 2208-11
(2007).

Loan servicers handle instances of default by mortgages in
two primary ways: (1) "default management," more commonly known
as foreclosures; and (2) "loss mitigation," such as a loan
modification.  Levitin & Twomey, supra, at 26.  The initiation of
foreclosure proceedings can be "a highly automated process with
virtually no discretion or oversight."  Id.  As described in In
re Taylor, 407 B.R. 618 (Bankr. E.D. Pa. 2009), rev'd, No. 09-cv-
2479-JF, 2010 WL 624909 (E.D. Pa. Feb. 18, 2010), rev'd in part,
vacated in part, aff'd in part, 655 F.3d 274 (3d Cir. 2011), in
many instances of default, it is an electronic case management
system without human involvement that selects and issues to local
counsel instructions to foreclose, along with the supporting loan
documentation and a performance timetable.  Id. at 627.  "In
contrast, handling defaulted loans through loss mitigation
involves tremendous discretion, expertise, and manpower."
Levitin & Twomey, supra, at 28.  Modifying a loan necessarily
involves contact between the loan servicer and mortgagor - making
the outcome dependent not only on the market and property
conditions, as in the case of foreclosure, but also on the
negotiations between the servicer and mortgagor and the
mortgagor's ability to comply with the modification.  Id.

"[I]nvestors are not concerned, however, about the

51

efficiencies for any particular loan, but rather the net
efficiencies of loss mitigation and default management for the
securitized pool of loans." Id. It is this calculus that places
the power to decide between foreclosure and modification
exclusively in the hands of the loan servicer.

> Even if hands-on loss mitigation results in smaller
> losses than merely proceeding straight to foreclosure,
> the transaction cost savings from automation and quick
> foreclosure might well offset the benefit of hands-on
> loss mitigation. The net efficiencies are likely dynamic
> and depend on market conditions. For example, more
> defaults mean more cost savings from automation, but
> might also mean greater losses as a result of proceeding
> straight to foreclosure, especially in a depressed
> market. Thus, when defaults rise, the efficiencies of
> automated loss mitigation could decline. The net
> efficiency balance is impossible to determine in the
> abstract, much less ex ante. Even ex post, determining
> the benefits of one approach or another is impossible
> because it necessarily involves comparison with a
> counterfactual. Thus, [residential mortgage-backed
> securities] investors are unlikely to bargain for one
> loss mitigation or default management largely up to
> servicers' discretion.

Id. at 28-29. Legal scholars have suggested that loan servicers,
without direction as to which option to pursue from the investors
or trustee acting on the investors' behalf, tend to elect the one
that serves their own economic interest: foreclosure. Id. at 29;
Diane E. Thompson, Nat'l Consumer Law Ctr., Why Servicers
Foreclose When They Should Modify and Other Puzzles of Servicer
Behavior: Servicer Compensation and Its Consequences (2009),
available at www.nclc.org/images/pdf/pr-reports/report-servicers-
modify.pdf ("A servicer deciding between a foreclosure and a loan
modification faces the prospect of near certain loss if the loan
is modified and no penalty, but potential profit, if the home is
foreclosed.").
    The typical compensation structure of a loan servicer
involves a mix of late and other ancillary fees, "float"
interest, and a percentage of the unpaid principal balance in the
trust. See Levitin & Twomey, supra, at 37. In operation, this
structure incentives a servicer initially to allow a mortgagor to
linger in default, accruing late fees. Id. at 75. During this
time, however, the servicer must pay advances to the trustee from
its own funds, and while these advances are recoverable, interest

on them is not.  Id. at 24, 47-48; Thompson, supra, at 25-26.
Once the cost of the advances begins to outweigh the late fees
being generated by holding the mortgagor in default, the
servicer's interest shifts rapidly to foreclosure.  Levitin &
Twomey, supra, at 51, 75.

> Moving to foreclose - and to sell the properties after
> foreclosure - can help servicers offset the costs of
> interest advances in two ways: first, once the property
> enters foreclosure and the servicer judges the loan can
> no longer be made performing, the obligation to continue
> making advances may cease, depending on various factors,
> and second, the advances can be recovered once the
> property is sold. Even if the investor takes a hit on the
> post-foreclosure fire sale, the servicer has stopped its
> bleeding and recovered any fees, costs, and advances.

Thompson, supra, at 26. Because servicing expenses are paid off
the top of foreclosure sale proceeds, loan servicers have little
incentive to maximize those proceeds for investors.  Levitin &
Twomey, supra, at 47.
     Yet, investors are without the information or capacity to
track servicers' handling of mortgage loans in default.  Id. at
58, 81; Thompson, supra, at 8.  While the typical pooling and
servicing agreement charges the trustee with protecting the
interests of the investors, the trustee's duties involve
reporting, not analyzing, data received from the loan servicer.
MBIA Ins. Corp. v. Royal Indem. Co., 321 F. App'x 146, 150 (3d
Cir. 2009).  The trustee is further disincentivized from
scrutinizing the performance of the loan servicer because, should
such scrutiny reveal real shortcomings, the trustee would have to
assume the unwelcome role of servicer.  Levitin & Twomey, supra,
at 58-62, 82.  The mortgagor-homeowner, the party to the mortgage
transaction most affected by loan servicing practices that favor
foreclosure over modification, is often unaware that his loan has
been securitized and that the servicing rights have been
transferred to a servicer with whom he has no direct contractual
relationship.  Id. at 83.  By the time of default, the homeowner
is in no position to negotiate a price that accounts for the
servicing risk inherent in his decision to take out a mortgage
loan months or years earlier.  Id. at 84.  Loan servicers are
thus virtually unchecked in their drive to bolster their own
bottom line, with foreclosure overwhelmingly the best economic
decision.
     What the process of securitization, and the market for loan
servicing that has developed to support it, highlights is that

53

loan servicers, despite their duty to act for the benefit of
investors, are in fact "principal-less agents."  Levitin &
Twomey, <u>supra</u>, at 81.  Their incentives in managing individual
loans do not mirror the interests of investors or trustees acting
on behalf of investors, much less homeowners.

And what of the communities where the homeowners live? Thus
far, the discussion has centered on the legal and practical
issues arising, as here, out of a foreclosure action.  The
unstated assumption, of course, is that the home has sufficient
value to be worth fighting over. An equally difficult issue is
presented by the community blight created by a tsunami of
thousands of abandoned homes.  Creola Johnson, <u>Fight Blight:
Cities Sue to Hold Lenders Responsible for the Rise in
Foreclosure and Abandoned Properties</u>, 2008 Utah L. Rev. 1169,
1171 (2008).  During the mortgage bubble era, many homeowners
could obtain a home with little or no down payment.  In hard
times, the best economic option presented to them was simply to
walk away from the home and spend their income for housing on
rental space.

What then?  The traditional hometown response has been to
slap a lien on the property for unpaid taxes.  This works only
when there is a ready market for the home, albeit at reduced
value, sufficient to enable the trust or loan servicer to make a
profit from foreclosure after paying off the tax lien.  Where the
market is stagnant or where no one stands to make money from
foreclosure, the banking industry simply walks away.  The
homeowner is judgment-proof.  The loan servicer, as agent, has no
authority to commit the trust's funds to pay taxes or to maintain
the property.  The trustee claims it has no responsibility as it
holds only the note and has nothing to do with the underlying
property (at least until they call upon MERS for legal title in
order to foreclose).  And MERS?  Here the ephemeral Janus-like
quality of the MERS structure comes starkly into view.  Faced by
an aggressive municipal policy of bringing common law nuisance
actions to require the "owners" to maintain their abandoned
homes, MERS can claim that it is nothing more than a nominee and
that registering "bare legal title" with it ought not subject it
to any larger obligation to the communities of the Commonwealth.

So serious are these concerns that this Court has considered
certifying the issue of the propriety of the MERS operation in
this Commonwealth to the Supreme Judicial Court.  A federal
district court may certify a question for decision by the Supreme
Judicial Court "if there are involved in any proceeding before it
questions of law of [the Commonwealth of Massachusetts] which may
be determinative of the cause then pending in the certifying
court and as to which it appears to the certifying court there is

As the MERS system demonstrates, even strict compliance with the statutory terms does nothing to ensure that real property is not conveyed fraudulently.  Homeowner-mortgagors, as non-parties

---

no controlling precedent in the decisions of [the Supreme Judicial Court]."  Mass. S.J.C. Rule 1:03 § 1 (2010).

Upon reflection, however, certification is inappropriate. Certification is "manifestly inappropriate . . . where . . . there is no uncertain question of state law whose resolution might affect the pending federal claim."  City of Houston v. Hill, 482 U.S. 451, 471 (1987).  See generally Gregory L. Aquaviva, The Certification of Unsettled Questions of State Law to State High Courts: The Third Circuit's Experience, 115 Penn St. L. Rev. 377 (2010).  This record does not present any issues of egregious manipulation or overreaching by the loan servicer (much less any suggestion of fraud or misrepresentation); nor does it involve abandoned property or the rights of the Town of Milton to its property tax base or to be free from community blight.  The situation might be different were Culhane's home located in Brockton, Fall River, Holyoke, Lawrence, Lowell, New Bedford, or a number of other communities of the Commonwealth. But cf. Jenifer McKim, Coakley Steps Up Probe into Foreclosure Fraud, Bos. Globe, July 26, 2011, at B5 ("[Massachusetts Attorney General Martha Coakley] is concerned that MERS failed to pay government fees as well as 'impaired the integrity' of the state recording system by failing to document loan transfers"); Press Release, John L. O'Brien, Jr., S. Essex Cnty. Registry of Deeds (Nov. 15, 2011) (estimating that the MERS system has cost the Commonwealth of Massachusetts $250,000,000 in recording fees), available at http://boston67.blog.com/files/2011/11/ Press-Release-Affidavit-11.15.11.pdf.  Here it suffices simply to raise these issues.  In light of this record and the state of the current Massachusetts statutory framework and decisional law, they are simply beyond the reach of this United States District Court.

to the assignments of their mortgages, are left with little recourse where they suspect impropriety.

C. **Standing of Aurora, as Assignee of MERS and Servicing Agent of Deutsche, to Foreclose**

The Court turns now to the ultimate issue in this case: the standing of Aurora, as holder of the mortgage by assignment from MERS and as the servicer of the loan on behalf of the note holder, Deutsche, to exercise the statutory power of sale and thereby foreclose Culhane's equitable right of redemption.  The legal framework having been addressed in great detail, the application of the law to the facts here, which are largely undisputed, need not be belabored.

Culhane's mortgage instrument is that of the standard MERS mortgage contract.  It conveyed to MERS, as the mortgagee of record as nominee for Preferred, only bare legal title to the mortgage.  The note originally was held by Preferred, but then was later transferred to Deutsche as trustee for the RALI Series 2006-QO5 Trust, into which Culhane's loan and others were pooled and converted into mortgage-backed securities.

On April 7, 2009, MERS, as nominee, assigned the mortgage to Aurora.  The assignment was executed before a notary public by JoAnn Rein, an employee of Aurora who, by corporate resolution, was also a vice president of MERS with the authority to make mortgage assignments on MERS's behalf.  At the time of the assignment of the mortgage from MERS to Aurora, Aurora already

was servicing Culhane's mortgage on behalf of Deutsche.   Aurora
became Deutsche's servicing agent for the mortgage loans in the
RALI Series 2006-QO5 Trust pursuant to a Master Servicing
Assignment and Assumption Agreement effective April 1, 2008.

Therefore, it was Aurora, through its employee, JoAnn Rein,
acting as MERS's agent, who caused the assignment of the mortgage
from MERS to it, so that it could foreclose.   By then, Culhane
had defaulted on her payments.   Aurora formally initiated
foreclosure proceedings on September 21, 2009, by sending the
notice of sale to be published.

The Court holds that there was no flaw in this process.
Under Massachusetts law, MERS lawfully held the legal title to
Culhane's mortgage in trust first for Preferred and subsequently
for Deutsche.   A purported officer of MERS then executed an
assignment of the mortgage from MERS to Aurora before a notary
public in accordance with Massachusetts General Laws chapter 183,
section 54B.   This assignment was made upon the request of
Aurora, who services Culhane's loan on behalf of Deutsche.   The
assignment was necessary to comply with the common law of
Massachusetts requiring unity of the note and mortgage in the
same entity prior to foreclosing.   Aurora, as Deutsche's loan
servicer, has an interest in the underlying debt; Aurora also
physically possesses the collateral file, including the note.
With the assignment of legal title to the mortgage from MERS,

57

Aurora became the mortgagee of record as well, thus perfecting its standing to bring a foreclosure action against Culhane.

Culhane makes much of the fact that the endorsement to Deutsche on the note and attached allonge is undated.  While this Court agrees as matter of law that the mortgagee must hold the note or be the servicing agent of the note holder <u>before</u> initiating foreclosure proceedings, here Aurora did.  Regardless of the date that Deutsche became the note holder, whether it was before or after the cut-off date for loans to be transferred into the RALI Series 2006-QO5 Trust, as of April 1, 2008, Aurora was servicing Culhane's loan for Deutsche.  Aurora caused legal title to the mortgage to be assigned to it over a year after becoming the servicing agent, and it did not send the notice of sale to be published until September 21, 2009.

The Court has given the MERS system its most searching inquiry, and yet the only foible detected - that is, the grant to MERS of the power of sale, despite it having no claim to the underlying debt - already has been remedied, <u>see</u> MERS Rule 8(d), and is of no moment in this case.  On this record, Aurora has proved its standing to foreclose and is entitled to a grant of summary judgment in its favor.

**IV.   CONCLUSION**

For the foregoing reasons, Aurora's Motion for Summary Judgment, ECF No. 8, is allowed.  Judgment shall enter for Aurora

declaring that it may foreclose the mortgage on Culhane's home in a commercially reasonable manner.

**SO ORDERED.**

       /s/ William G. Young
William G. Young
District Judge